UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/29/2021

-----------------------------------------------------------------x
Admiral Insurance Co.,

                         **Plaintiff,**

          -against-

Niagara Transformer Corp.,

                         **Defendant.**
-----------------------------------------------------------------x

20-CV-4041-ALC

<u>Opinion and Order</u>

**ANDREW L. CARTER, JR., United States District Judge:**

A historical insurance carrier (Admiral Insurance Company) brings this declaratory judgment action seeking a declaration that its insurance policy does not cover defense and indemnification of its insured (Defendant Niagara Transformer Company) in connection with litigation arising from exposure to and contamination by Polychlorinated Biphenyls. Niagara moves to dismiss the Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), primarily arguing that this action is not yet a case-or-controversy under the Declaratory Judgment Act (28 U.S.C. § 2201). For the reasons stated in this opinion, the Court agrees and dismisses this action for lack of subject matter jurisdiction.

<b>BACKGROUND</b>

<u>I. Factual Background</u>

The following facts are taken from the Complaint, as well as the Parties' exhibits, declarations, and affidavits accompanying their motion to dismiss briefing.[1]

---

[1] Plaintiff incorporates by reference its Local Civil Rule 56.1 Statement from the pending Motion for Summary Judgment for the facts section of its opposition to the instant motion to dismiss. Because the Parties' competing Rule 56.1 statements go to the summary judgment issues, the Court does not refer to or rely on these filings, or any of the summary judgment briefing and supporting papers, for purposes of deciding this motion to dismiss.

Admiral Insurance Company ("Admiral" or "Plaintiff") is an approved surplus lines insurance company in New York that sells its policies in New York. Compl. ¶¶ 1. It is a Delaware corporation with its principal place of business in Scottsdale, Arizona. *Id.* Niagara Transformer ("Niagara" or "Defendant") is a New York corporation with its principal place of business in Buffalo, New York. *Id.* It has been in business since 1958 and has approximately 100 employees. *Id.*; Def.'s Mem. at 3 (citing Darby Aff. at ¶ 2).

In the 1960s and 1970s, Niagara purchased polychlorinated biphenyls products ("PCBs") that Pharmacia, LLC f/k/a Monsanto Co. (a/k/a "Old Monsanto"), Monsanto Co. and Solutia, Inc. (collectively, "Monsanto") manufactured for use in transformers. Def.'s Mem. at 3. At that time, Niagara purchased an essential component—Askarel—from Old Monsanto as they were the only manufacturers of that product. *Id.* (citing Darby Aff. at ¶ 3). On January 7, 1972, Monsanto and Niagara executed the Special Undertaking by Purchasers of Polychlorinated Biphenyls ("Special Undertaking"), which included, among other things, the following terms:

> . . . .
>
> Buyer here covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agrents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.
>
> All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.
>
> . . . .

Def.'s Mem., Ex. B.

2

In addition to the Special Undertaking, Monsanto required PCB buyers, including Niagara, to purchase "adequate insurance protection." Def.'s Mem., Ex. A. Niagara obtained an insurance policy with Admiral (the "Policy"), General Liability Policy No. 6CG-1839, with a term that ran from July 30, 1976 to July 30, 1977.[2] Compl. ¶¶ 8; Def.'s Mem., Exs. H, I. Niagara did not stop using Askeral for its transformers until around 1978. Def.'s Mem. at 4 (citing Darby Aff. at ¶ 8).

On or about August 29, 2016, Monsanto submitted a letter to Niagara demanding defense and indemnification costs in connection with lawsuits totaling millions of dollars in judgments and settlements arising from underlying PCB-related litigation. Compl. ¶¶ 7, 10; Def.'s Mem., Ex. C. The letter stated that Monsanto had been sued in multiple lawsuits by "a number of individuals, cities, municipal agencies, and school districts" to "recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto." Def.'s Mem., Ex. C. The letter further indicated that Monsanto had entered into a special undertaking agreement with Niagara in 1972 and enclosed a copy of such with the letter. *Id.* It then demanded that Niagara "defend, indemnify, and hold harmless" Old Monsanto and related entities. *Id.* After providing a breakdown of the PCB-related litigation against Monsanto at that time, to include the "Food Chain Cases," the "Water Cases," the "School Cases," and the "Occupational Case," Monsanto requested that Niagara provide within ten days its intent to honor its contractual defense and indemnification obligations under the Special Undertaking and "immediately notify" its insurer(s) about the defense and indemnification obligations set forth in the letter. *Id.* Finally, Monsanto offered to discuss the

---

[2] The Insuring Agreement of the Policy is excerpted in the Complaint. Compl. ¶¶ 15-18. Niagara contends that the Insuring Agreement may not constitute the full and complete material terms of the Policy. Def.'s Mem. at 7-8.

PCB-related litigation and "the scope of Niagara Transformer Corporation's obligations under the Special Undertaking Contract" and acknowledged that "New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties." *Id.*

On February 15, 2017, Niagara responded to Monsanto objecting to any defense or indemnity obligation.[3] Def.'s Mem., Ex. D. Niagara objected upon review of the various complaints against Monsanto, arguing that "the indemnity clause is unenforceable due to Monsanto's fraudulent conduct" and alleging that Niagara and other buyers "were fraudulently induced to execute the Undertakings and, therefore, they are unenforceable." *Id.* It further contended that the Special Undertaking is unenforceable "to the extent it purportedly provides indemnity to Monsanto for Monsanto's intentional, reckless, and/or grossly negligent acts." *Id.* In addition, for several reasons, their letter argues at length that "it is unclear that Niagara Transformer would owe any obligation to the entities on whose behalf the tenders were made" as Niagara executed the Special Undertaking with "Old Monsanto"—not the "New Monsanto Company." *Id.* Niagara then cited the limiting language in the Special Undertaking regarding indemnity, suggesting that—to the extent any claims arise out of PCB's sold by Monsanto to Niagara after the execution of the Special Undertaking on January 7, 1972—they would not trigger the Policy. *Id.* Finally, Niagara denied liability for any of the claims in connection with each category of PCB-related litigation. *Id.*

On April 7, 2017, Monsanto sent correspondence to Niagara about an informational meeting for approximately 26 companies, including Niagara, from whom Monsanto had

---

[3] Monsanto apparently sent a second tender letter to Niagara, dated December 23, 2016, which neither party provides to the Court but is referenced in Niagara's response to the tender letters, Def.'s Mem., Ex. D., as well as Admiral's correspondence to Niagara disclaiming coverage. Def.'s Mem., Ex. J.

4

demanded defense and indemnification based on special undertaking agreements executed in the early 1970s. Def.'s Mem., Ex. E. The letter stated that at the meeting Monsanto would "provide information regarding the indemnitors' shares of post-January 1972 PCB sales, the status of Monsanto's settlement of the Food Chain Cases, past and ongoing defense costs incurred in the PCB litigation, and options for resolving each company's liabilities outside the context of formal litigation." *Id.* Based on their own assessment, the letter stated that Niagara had purchased over 2.3 million pounds of PCBs after January 7, 1972, representing 1.6% of all PCBs purchased "after January 1972 by domestic indemnitors who remain viable companies." *Id.* Though Monsanto wrote that it believed Niagara is jointly and severally liable for "the full amount of the $280 million Food Chain Cases settlement," it noted that (i) Niagara's 1.6% share was $4,480,000 with (ii) accruing prejudgment interest owed to Monsanto. *Id.*

Monsanto and Niagara exchanged other correspondence regarding defense and indemnity obligations in connection with new lawsuits against Monsanto as they were filed. Def.'s Mem. at 6; Darby Aff., Ex. J. Niagara was not named in any of those underlying lawsuits nor did those claimants allege that Niagara was to blame for their alleged damages. *Id.* Monsanto has not sent any additional demand or tender to Niagara since October 14, 2019. Def.'s Mem. at 6 (citing Darby Aff. at ¶ 16). To date, Monsanto has not filed suit against Niagara, seeking to enforce the Special Undertaking or otherwise, and they have never explicitly threatened to sue Niagara.[4] *Id.* (citing Darby Aff. at ¶ 18).

In or around March 2020, Niagara became aware of an action in Missouri state court, *Monsanto Co. v. Magnetek, Inc.*, 17AL-CC03368, for which Magnetek had obtained coverage from its historic insurance carrier in a separate declaratory judgment action in Illinois. *Id.* at 7.

---

[4] The current record does not reflect that this fact has changed. To date, the Court has not been notified by either party that Monsanto has sued Niagara or directly threatened to do so.

On the assumption that Monsanto might sue Niagara based on allegations like those in the *Magnetek* state action, Darby Aff. at ¶ 19, Niagara further investigated and ultimately identified Admiral as its historic insurance carrier from the 1970s and placed them on notice on March 11, 2020. Def.'s Mem. at 7. At that time, Niagara did not have a copy of the Policy. *Id.* The notice letter indicated, *inter alia*, that Niagara had rejected Monsanto's demands and tender and that Niagara had no knowledge of any suit against them by Monsanto. Def.'s Mem, Ex. F. Nonetheless, Niagara wrote that Monsanto had alleged breach of contract and negligence claims in the *Magnetek* action and that "it is reasonable to assume Monsanto may ultimately file an action against Niagara Transformer making similar allegations to those Monsanto is making against Magnetek." *Id.* Niagara then demanded that Admiral cover defense and indemnification "in connection with any and all claims made by Monsanto." *Id.* On March 27, 2020, Admiral replied and requested more information, including a copy of the August 29, 2016 demand and tender letter from Monsanto to Niagara. Compl. ¶¶ 12. On April 14, 2020, Niagara responded to the information requests. *Id.* ¶¶ 13.

On April 21, 2020, Admiral wrote letters to both Niagara and Monsanto disclaiming coverage, stating that it had no duty to defend or indemnify Niagara in connection with the claims asserted in the August 26, 2019 tender letter from Monsanto. *Id.* ¶¶ 14; Darby Aff., Exs. J, K. Admiral based its denial on Niagara's "failure to provide timely notice of the demands . . .[,] the absence of any bodily injury or property damage included within the completed operations hazard or the products hazard, and based on exclusions (a) and (i) of the Admiral Policy." Darby Aff., Ex. J. The following day, Niagara requested an electronic copy of the Policy via email, and Admiral responded with an attachment containing "a copy of [the] Admiral policy 6CG1839 (7/30/76 To 7/30/77) and a specimen copy of the policy jacket in use at

the time the policy was issued, containing coverage terms, definitions, conditions, etc."[5] Darby Aff., Ex. G. As for Monsanto, the record does not contain evidence that they ever responded to Admiral's letter providing notice that it had denied Niagara coverage in connection with the PCB-related litigation.

In June 2020, Niagara became aware of Bayer AG settlements of certain of the "Water Cases" that sought recovery from Monsanto. Def.'s Mem. at 8 (citing Darby Aff. ¶ 25; Honecker Decl. ¶ 4-6). Neither Bayer nor Monsanto consulted with, neither did Niagara otherwise participate, in the settlement negotiations surrounding these cases. Def.'s Mem. at 9 (citing Darby Aff. ¶ 26. Neither Bayer nor Monsanto contacted Niagara regarding any indemnity obligation, pursuant to the Special Undertaking or otherwise, related to the settlement of these certain of the "Water Cases." Def.'s Mem at 9 (citing Darby Aff. ¶ 26).

II. Procedural History

On May 26, 2020, Admiral filed this declaratory judgment action seeking declaration that it has no obligation to defend or indemnify Niagara in connection with the claims asserted in or arising out of the August 26, 2019 letter from Monsanto due to Niagara's failure to provide timely notice in compliance with the Policy, Compl. ¶¶ 23, the claims being outside the scope of coverage of the Policy, *id.* ¶¶ 29, the claims being excluded from coverage by exclusion provisions (a) and (i) of the Policy, *id.* ¶¶ 34, 41, and the claims' failure to constitute an "occurrence" or to fall within the coverage period. *Id.* ¶¶ 44, 45. Niagara moved to dismiss for lack of subject matter jurisdiction on September 1, 2020. Admiral filed its opposition on September 15, 2020. On September 22, 2020, Niagara submitted a reply. The Court considers this motion fully briefed.

---

[5] Niagara believes that the forwarded copy of the Policy "may not include all of the material terms." Def.'s Mem. at 7-8.

7

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) requires courts to dismiss a case for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional authority to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). When considering a motion to dismiss for lack of subject matter jurisdiction under Fed R. Civ. P. 12(b)(1), the district court must take all uncontroverted facts in the complaint as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011), *cert. denied*, 568 U.S. 1229 (2013). Where jurisdictional facts are at issue, "'the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *see also Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). "[N]o presumptive truthfulness attaches to the complaint's jurisdictional allegations." *Figueroa v. Comm'r of Soc. Sec.*, No. 12-cv-7129 (LGS)(SN), 2013 WL 3481317, at *2 (S.D.N.Y. July 11, 2013) (internal quotation marks omitted) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F.Supp. 94, 95 (S.D.N.Y. 1996)). But "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Makarova*, 201 F.3d at 113.

**DISCUSSION**

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001). "[D]eclaratory-judgment actions that satisfy

the case-or-controversy requirement" are "definite and concrete, touching the legal relations of parties having adverse legal interests . . . real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)). The dispute "must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Jenkins v. United States*, 386 F.3d 415, 417-18 (2d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952)). "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action . . . . Rather, courts should focus on 'the practical likelihood that the contingencies will occur.'" *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

      The dispute at the heart of Niagara's motion to dismiss is whether this action satisfies the case-or-controversy requirement under the DJA. The Parties agree that this case turns on whether there exists a practical likelihood that the contingencies will occur. The contingency here is whether Niagara will incur liability for defense and indemnity to Monsanto in connection with the PCB-related litigation. Niagara contends that this action is not fit for adjudication because, to date, Monsanto has filed no lawsuit against Niagara alleging any defense or indemnity obligation, pursuant to the Special Undertaking or otherwise, in relation to the PCB cases.

Admiral contests this position, arguing that Niagara's March 11, 2020 notice correspondence to Admiral and Admiral's own subsequent denial of coverage to Niagara—by letter dated April 21, 2020—sufficiently demonstrates that there is a substantial controversy that warrants issuance of a declaratory judgment.

The Court concludes that Admiral has failed to show that there is a practical likelihood that the contingencies will occur. Specifically, the PCB-related litigation is a sizeable, complex set of cases, involving a wide range of distinct plaintiffs, defendants, and alleged indemnitors. Considering all the specific facts and circumstances, this Court concludes that there can be no substantial controversy under the DJA, as between Niagara and Admiral, as separate and distinct questions over the validity, scope, and enforceability of the Special Undertaking between Old Monsanto and Niagara remain. Issuance of a declaratory judgment now, where Monsanto is not a party to the present action and Niagara's defense and indemnity obligation to Old Monsanto is unknown, would be premature. On the current record, this action does not pose "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Maryland Casualty Co.*, 312 U.S. at 273. It must, therefore, be dismissed for lack of subject matter jurisdiction.

In the Second Circuit, "litigation over insurance coverage has become the paradigm for asserting jurisdiction despite 'future contingencies that will determine whether a controversy ever actually becomes real.'" *Associated Indem. Corp.*, 961 F.2d at 35 (citation omitted). "In applying the practical likelihood test, the Court focuses on whether there is a pending litigation or the likelihood of future litigation that may require Plaintiff to indemnify Defendant." *Id.* In *Associated Indem. Corp.*, a Second Circuit panel, among other things, reviewed for clear error a district court's factual finding—that the insured "could not reasonably have believed" that it

would reach the $25 million threshold to trigger the excess insurance policy—in determining whether the district court had abused its discretion in granting a sanctions motion against the insured.[6] *Id.* The court reasoned that there was a practical likelihood that liabilities would trigger the policy. *Id.* at 35-36. They reasoned that (i) the ranges of estimates for remediation costs from the Environmental Protection Agency (EPA), (ii) increased costs due to inflation, and (iii) the commencement of a $7 million suit against the insured collectively suggested that the insured likely faced liabilities that exceeded the $25 million threshold, thus triggering the policy. *Id.* The Second Circuit ultimately reversed the district court's sanctions ruling based upon its assessment of practical likelihood. *Id.* at 36.

Admiral mischaracterizes and misapplies the test for practical likelihood. District courts in this Circuit generally find a practical likelihood exists in insurance declaratory judgment actions where there is a separate, underlying third-party action against the insured. *See, e.g.*, *Allstate Ins. Co. v. Tenn*, No. 3:19-CV-432 (JBA), 2020 WL 3489387, at *4 (D. Conn. June 26, 2020). "[D]eclaratory judgments are issued in cases where insurance companies seek to determine their duties *prior to the full adjudication of an underlying controversy*."[7] *Id.* (collecting cases) (emphasis added); *see also Empire Fire & Marine Ins. Co. v. Estrella*, No. 18CV3422KAMPK, 2019 WL 6390193, at *8 (E.D.N.Y. Sept. 13, 2019), *report and*

---

[6] As background, in this case the Second Circuit reviewed an insured's appeal arguing that the district court abused its discretion in granting an excess insurer's motion for sanctions under Fed. R. Civ. P. 11. The insured, accused by third parties of certain environmental liabilities, sought coverage from its excess insurer in a declaratory judgment action. *Id.* at 33-34. The excess insurer believed that its insurance policy could not be triggered and requested the insured's consent to voluntarily dismiss the action. *Id.* at 33. The insured refused so the excess insurer moved to dismiss the action and to sanction the insured. *Id.* The parties ended up settling as to the motion to dismiss before a ruling was made, however, the district court granted the sanctions motion. *Id.* at 34.

[7] Admiral incorrectly argues that *Empire Fire & Marine Ins. Co. v. Elrac, Inc.*, 2006 WL 3734308, at *9 (S.D.N.Y. Dec. 18, 2006), stands for the proposition that "it is well settled that declaratory judgment actions often are brought at an early stage." Pl.'s Opp. at 6. The court in that case acknowledged the correct and applicable rule under *Maryland Cas. Co.*, 312 U.S. 270 (1941), stating that a live controversy exists under the DJA regardless of whether an underlying action has proceeded to judgment. *Empire Fire*, 2006 WL 3734308, at *2-3. But, unlike the present case, there was an underlying action that had not yet proceeded to judgment.

11

*recommendation adopted,* No. 18-CV-3422 (KAM)(PK), 2019 WL 4744208 (E.D.N.Y. Sept. 30, 2019) ("[T]he contingency is Plaintiff's duty to defend and indemnify [insured] in the [u]nderlying [a]ctions, which have already been brought . . . and which subject [the insured] to over $1.2 million in damages."). "[T]here must be a 'practical likelihood' that some form of judgment or settlement will be forthcoming*." Lafarge Canada Inc. v. Am. Home Assurance Co.*, No. 15-CV-8957 (RA), 2018 WL 1634135, at *5 (S.D.N.Y. Mar. 31, 2018) (citing *Fed. Ins. Co. v. SafeNet, Inc.*, 758 F.Supp.2d 251, 261 (S.D.N.Y. 2010)). This is a fact-intensive analysis to be decided on a case-by-case basis. *Id.* For example, a duty to defend is of sufficient immediacy and reality where "the [i]nsurers are currently providing a defense to [insureds]" under the insurance policy. *Lafarge*, 2018 WL 1634135, at *6. A logical corollary of this point is that no "substantial controversy" in connection with a duty to defend can exist where the insured has not incurred any defense costs because there is no lawsuit or settlement to defend.

The present case is distinguishable. It is undisputed that the record does not contain evidence that "some form of judgment or settlement will be forthcoming" as to Niagara's alleged defense and indemnity obligation to Monsanto. Admiral also does not allege that they have paid any defense or indemnification costs on behalf of Niagara yet. In fact, Monsanto already sued Magnetek in or about March 2020 in Missouri state court for negligence and breach of their special undertaking contract. Though Niagara assumed they would be sued, to date, Monsanto has not commenced any lawsuit against Niagara. In or about June 2020, Bayer AG settled certain "Water Cases" filed against Monsanto. Neither Bayer nor Monsanto reached out to Niagara in connection with these "Water Cases" settlements. As a matter of fact, Niagara asserts that they became aware of these settlements through press reports—not through Monsanto directly.

Admiral also fails to show that—absent an underlying action—Niagara is likely to incur any liability in connection with the PCB-related litigation in the future. District courts have found a practical likelihood exists in insurance cases where it was reasonable to predict that the insured would incur enough liabilities to trigger the insurance policy. *See, e.g.*, *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154, 177–78 (2d Cir. 2001) ("Squibb had incurred approximately $100 million in damages . . . . an estimated 900 [] claims were still pending against Squibb . . . and Squibb's expert averred that it was reasonable to predict that Squibb would incur $100 million in additional [] indemnity and defense expenses in the future."). Unlike Squibb, Niagara has not incurred any amount in damages nor has any independent expert or consultant predicted that Niagara would incur any defense or indemnity expenses in the future in connection with PCBs.

Admiral's reliance on *American Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435 (2d Cir. 1995), is inapposite. Aside from the fact that justiciability was not the issue before the court in that case, there, it was evident that a practical likelihood of liability existed. The insured had entered into a consent order with the New York State Department of Environmental Conservation (NYSDEC) stipulating that the allegedly polluted sites at issue constituted "a significant threat to the environment" and stated that a remediation plan "might be required." *Id.* at 437. An independent consultant hired by the insured advised that it would be "impossible" to show that the site was not hazardous. *Id.* And after further negotiation with the New York state government, the insured prepared internal notes stating that "remedial action will be required" and, a year later, the NYSDEC reclassified the sites (which mandated remediation). *Id.* Finally, the parties had actively engaged in settlement discussions and had already settled disputes involving four of the five sites at issue. *Id.* at 438.

Here, the enforceability of the Special Undertaking or other legal relations between Old Monsanto (and its related entities) and Niagara is unknown. Monsanto has not litigated the question over whether Niagara owes defense and indemnity in connection with the PCB cases. No PCB case yet names Niagara as a defendant. And neither Monsanto or Bayer involved Niagara in the "Water Cases" settlements reported in or about June 2020.[8] Because it is unknown whether Monsanto will ever pursue future litigation against Niagara and the validity and scope of the Special Undertaking is also undetermined, "future litigation that may require [Admiral] to indemnify [Niagara]" is unlikely. *Associated Indem. Corp.*, 961 F.2d at 35. "[T]he facts do not show a substantial and immediate controversy" between Admiral and Niagara "as parties with adverse legal interests." *Twin City Fire Ins. Co. v. Innovative Aftermarket Sys., L.P.*, 597 F.Supp.2d 295, 300 (D. Conn. 2009) (citing *Flast v. Cohen*, 392 U.S. 83, 96 (1968). Therefore, "[t]he Court cannot proceed without violating the constitutional prohibition against giving advisory opinions." *Id.*

The Court is aware that the facts and circumstances in the complex PCB-related litigation could change in the future. It is possible that people and entities file lawsuits against Niagara in connection with its purchase and use of PCBs for its transformers. Alternatively, it is possible that Monsanto sues Niagara to enforce the Special Undertaking or on some other

---

[8] The out-of-circuit case based in part on substantive Virginia law, *Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc.*, 474 F.Supp.2d 779 (E.D. Va. 2007), also fails to support Admiral's position. There, the court concluded that a third-party plaintiff's submission of a claim to the insureds for alleged injuries, her "settlement demand" to them totaling $75,000, and her sworn deposition testimony sufficiently demonstrated that there was a justiciable controversy before that court. *Id.* at 788. The third party clearly intended to impose liability on the insureds in *Firemen's Ins. Co.* despite having not yet filed any lawsuit. To the contrary, here, Monsanto issued its demand pursuant to the Special Undertaking but it is unknown if, and to what extent, the Special Undertaking is valid and enforceable. Moreover, Admiral does not dispute that Monsanto has not contacted Niagara regarding defense and indemnity since October, 14, 2019 while Monsanto has actively pursued settlement and litigation against other entities.

grounds for indemnity. At that time, Admiral may have a case-or-controversy under the DJA. But based on the current record, this action does not yet pose a substantial controversy.

Considering the specific circumstances surrounding the present action, there is insufficient evidence in the record of a practical likelihood that the contingencies will occur. Indeed, the practicalities here show that the controversy here is not substantial, immediate, or real. Admiral commenced this declaratory judgment action against Niagara approximately 16 months ago, Niagara moved to dismiss over 12 months ago, and despite pursuing other potential indemnitors—e.g., Magnetek—it is undisputed that that there is still no underlying litigation against Niagara. Finally, Bayer and Monsanto did not include Niagara in the Bayer settlement of certain "Water Cases" related to PCBs. Thus, this action for a declaration regarding whether Admiral is obligated to cover Niagara in connection with the insurance policy is too theoretical and speculative.

Because this action is dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court does not reach Admiral's arguments about the Policy terms, including its premature late notice defense.

## CONCLUSION

For the reasons stated above, Defendant Niagara's motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), is hereby **GRANTED**. Accordingly, Plaintiff Admiral's declaratory judgment action against Niagara is dismissed without prejudice. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

**Dated:** September 29, 2021
New York, New York

**The Hon. Andrew L. Carter, Jr.**
**United States District Judge**